# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | |
|---|---|
| HEATHER ARY, | : |
| Plaintiff, | : |
| | Case No. 3:16cv00102 |
| vs. | : |
| | District Judge Walter H. Rice |
| NANCY A. BERRYHILL, | : Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | |
| Security Administration, | : |
| Defendant. | : |

## REPORT AND RECOMMENDATIONS[1]

## I. Introduction

A Social Security Administrative Law Judge (ALJ), Amelia G. Lombardo, issued a decision in July 2014 concluding that Plaintiff Heather Ary was not under a disability and, as a result, was not eligible to receive Supplemental Security Income. ALJ Lombardo's decision considered and placed little weight on the opinions provided by Dr. Hogan, Plaintiff's primary care physician. This was error, according to Plaintiff, because the record contains objective and opinion evidence that supports Dr. Hogan's opinions. Plaintiff seeks an Order remanding this case for an award of benefits or, at a minimum, for further proceedings.

The Commissioner contends that the ALJ properly evaluated Dr. Hogan's opinion and substantial evidence supports her evaluation. The Commissioner seeks an Order affirming

---
1 Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

ALJ Lombardo's decision.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), the administrative record (Doc. #5), and the record as a whole.

## II.  Plaintiff's Vocational Profile and Testimony

On the date Plaintiff filed her application for benefits, she was thirty-nine years old and thus considered a younger person under social security law. *See* 20 C.F.R. § 416.963(c). ALJ Lombardo concluded that Plaintiff has at least a high school education and has no past relevant work experience.

During an administrative hearing held by ALJ Lombardo, Plaintiff testified that her health problems include asthma, fibromyalgia, and post-traumatic stress disorder. She has panic attacks four to five times a week, each lasting one or two hours. She experiences pain in her back, legs, hips, and shoulders. She can walk about half a city block. She can usually stand (on a single occasion) for sixty to ninety minutes at most. She can sit for thirty to forty-five minutes. A small amount of marijuana helps alleviate her pain. *Id*. at 75. But pain causes her to wake up six or seven times a night. She sleeps just three complete hours each night. *Id*. at 72.

Plaintiff explained that she when she tries to grasp an item, her hands relax and she'll drop it. In her daily life, she lifts no more than three pounds. During a typical day, she wakes in the morning between ten and eleven. She makes toast or something so she can take her medication. She sits on the couch until she has to get up and do something, like take a

shower, clean up after her breakfast, or feed the cat. While sitting on the couch, she puts her ankles into a "strap system" so she can lift them above the level of her heart— it helps "a slight bit with the swelling." (Doc. #5, *PageID* #68). She does this two or three times a day, each time for about thirty minutes to two hours. Swelling in her legs makes them feel like "they're going to burst." *Id*. at 70. She uses the straps to help drain fluid from her legs.

Plaintiff keeps the temperature in her home between 68 and 72 degrees because "cold makes [her] hurt more and the heat makes [her] swell up more." *Id*. at 70-71. She testified that she has Factor V Leiden thrombophilia (an inherited blood-clotting disorder).[2] *Id*. at 74. She's had two blood clots in her legs and a pulmonary embolism. Doctors are not certain whether Factor V Leiden thrombophilia causes swelling in her body. She explained that it "does cause [her] to get groggy mentally at times." (Doc. #5, *PageID* #74). This occurs daily.

Plaintiff experienced a grand mal seizure in February 2011 and has "focal seizures." *Id*. at 73. She does not recognize when she is having a focal seizure, but she has been told they last a minute or two. They occur several times a week. She has diabetes (Type II), which is under control. She has bipolar disorder: She'll be happy one second then suddenly get really sad or angry. *Id*. at 74.

In the afternoon, Plaintiff drives four blocks to a part-time job at a convenience store, which she had just started during the month of the ALJ's hearing in May 2014. She was having difficulty at work. Her boss told her to move faster or she would not be employed

---

2 *See* http://ghr.nlm.nih.gov/condition/factor-v-leiden-thrombophilia.

much longer.  *Id*. at 73.  She worked in the afternoon for either two or four hours.  After work, she returns home, sits, and rests her legs in the straps.  *Id*. at 68-69.  Her doctors want her to exercise, but they do not want her to walk too much because she falls a lot (three to five times a week).  *Id*. at 71.

As to Plaintiff's other daily activities, she vacuums "in small spurts …."  *Id*. at 69.  She does not lift laundry.  She does not make the beds because she "can't snap [her] arms to make the blankets."  *Id*.  She does light cleaning, like picking up and throwing away light things (papers and such).  She cooks some and grocery shops when someone can go with her to lift heavy items.  She explained that about three times a month she needs help washing her hair because she can't raise her arms over her head.  She does the dishes in increments lasting five to ten minutes due to leg pain and swelling or because her hands will swell so much she can't grip.  *Id*. at 71.  Her hands swell that much at least once a day.

Plaintiff was hospitalized in August 2013 with suicidal thoughts.  At the time of the ALJ's hearing (May 2014), she was still struggling weekly with suicidal thoughts.  Her symptoms of post-traumatic stress include flashbacks, trembling, and crying.  She experiences flashbacks two or three times each week.  She has nightly nightmares that wake her.  Dealing with customers at the convenience store causes her to cry when she gets home from work.  *Id*. at 73.

### III. Medical Evidence

#### A. Dr. Hogan

Plaintiff first saw her primary care physician, Penny S. Hogan, MD, in August 2006.

4

Plaintiff's mood and affect at that time were depressed, tearful, and frightened. (Doc. #5, *PageID* #706). Her husband had died recently. *Id*. at 705. Dr. Hogan diagnosed adjustment reaction with mixed emotional features and depression. *Id.* at 706. On September 01, 2006, Plaintiff saw Dr. Hogan. She reported still not being able to sleep. *Id*. at 703. Dr. Hogan noted that Plaintiff's mood and affect were "appropriate to the situation and was depressed." *Id*. at 704. She diagnosed Plaintiff with anxiety, depression, adjustment reaction with brief depressive reaction, and insomnia associated with anxiety. *Id.* In November 2006, Dr. Hogan saw Plaintiff, after her overnight hospitalization for a suicide attempt. *Id*. at 697. It is noted, "She admits today this is her SEVENTH suicide attempt …." *Id*. (emphasis in original).

Plaintiff saw Dr. Hogan in June 2007 for a follow-up to an admission at Greene Memorial Hospital with left leg swelling from a DVT (Deep Vein Thrombosis). *Id*. at 689-91). Plaintiff also followed up with Dr. Hogan in late June 2007. Dr. Hogan diagnosed her with anxiety, depression, thrombosis, and controlled type II diabetes with neurologic manifestations. *Id*. 687-88.

Plaintiff returned to see Dr. Hogan in June 2009. She reported having a recent meltdown caused by family stress, the anniversary of her mother's death, and other issues. Dr. Hogan noted Plaintiff seemed emotional and had some anxiety. *Id.* Dr. Hogan saw Plaintiff in August 2009, describing whole-body pain, increased back pain, and left lower-leg pain in radicular distribution. *Id*. at 666. Physical exam showed she was mildly uncomfortable, had increased sensitivity to light. She was tender to palpation in multiple

5

areas consistent with fibromyalgia, but Dr. Hogan explained, "generalized body pain is a newer complaint from her only a few months old, although she states she has had increased body pain for years. *Id*. at 668. Her back was tender with some decreased forward bend and extension. Pain radiated down her left leg. *Id.* Plaintiff continued to see Dr. Hogan through early December 2009. *Id*. at 670-86.

Plaintiff continued seeing Dr. Hogan during 2010 through 2012, at least. *Id*. at 292-359. In August 2011, Dr. Hogan completed a one-page form concerning Plaintiff's work abilities during an eight-hour workday. She listed Plaintiff's diagnoses as bipolar disorder, anxiety, and myofascial pain. She thought Plaintiff's prognosis was "fair." She opined that Plaintiff could stand/walk for two and one-half hours, sit for two and one-half hours, and alternatively sit or stand for two and one-half hours, provided she could change positions for two and one-half hours. *Id*. at 406. Dr. Hogan checked boxes indicating her opinions that Plaintiff could frequently lift up to ten pounds and occasionally lift up to twenty pounds. Dr. Hogan believed that Plaintiff could occasionally maintain concentration and attention, occasionally perform activities within a schedule, occasionally interact with the general public, but she could not at all sustain an ordinary routine. Dr. Hogan declined to release Plaintiff for full-time or light-duty employment. *Id*.

In March 2012, Dr. Hogan completed a basic medical form. She described Plaintiff's medical conditions a seizure disorder, depression, bipolar disorder, generalized anxiety disorder, hypercoagulable state, fibromyalgia, and post-traumatic stress disorder. *Id*. at 407. These had been present for more than two years. Dr. Hogan noted that Plaintiff had fatigue,

6

decreased strength, moderate pain in her back, legs, and shoulders; moderate stable depression with anxiety features; rare episodes of mania; and recent seizure activity, "now on meds." *Id*. Based on her observations during Plaintiff's office visits, Dr. Hogan opined that she could stand/walk one hour without interruption for a total of two hours during an eight-hour workday; she could sit one hour without interruption for a total of two hours during an eight-hour workday; she could lift/carry frequently up to ten pounds and occasionally up to twenty pounds. *Id*. at 408. Dr. Hogan also found Plaintiff moderately limited in her ability to bend. Dr. Hogan marked boxes (adding the term "psychiatric") indicating that Plaintiff was moderately limited in repetitive-foot movement, seeing, hearing, and speaking. And, Dr. Hogan checked a box indicating that she expected Plaintiff's limitations to last twelve months or more. *Id*.

Also in March 2012, Dr. Hogan completed a mental-functional-capacity-assessment form. She opined that Plaintiff was markedly limited in most areas. *Id*. at 409. She noted that Plaintiff had multiple episodes of anxiety; social phobia, on a frequent basis; mostly fair judgment; and chronic depression. *Id*. at 410.

### B. Other Medical Evidence

Bikram Verma Ansil, MD saw Plaintiff in December 2009 for a variety of digestive problems. *Id*. at 709. She continued to see him until March 20, 2010. *Id*. at 709-19. On February 13, 2010, Dr. Abnsil assessed her with diabetes, depression, asthma, and "DVT with factor 5 deficiency." *Id*. at 718. He also noted she had anxiety and depression and he felt, "part of her symptoms may be due to that." *Id.*

7

Plaintiff's mental health records include a psychiatric assessment by Bobbie Fussichen, CNS, in July 2008. *Id*. at 636-41. This occurred near the date Plaintiff's husband died. Plaintiff indicated that she still was not sleeping, had a decreased appetite, anxiety, poor concentration. She told Ms. Fussichen that she was depressed, experienced panic attacks when leaving her house, and felt helpless. *Id*. at 636-638. Upon mental status exam, Ms. Fussichen noted that Plaintiff's mood was depressed, she had decreased concentration, and she felt helpless. *Id*. at 640. Ms. Fussichen diagnosed Plaintiff with bipolar disorder, most recent episode depressed; blood clotting disorder; multiple losses; and an estimate of her Global Assessment of Functioning (GAF) at 45. *Id*. at 641.

Plaintiff went to Advanced Therapeutic Services in March 2010 where she was diagnosed with bipolar disorder, mixed; anxiety disorder NOS; and was assigned a GAF of 54. *Id*. at 403-05. It is noted that she reported sleeping too much or going without sleep, was depressed, paranoid at times around people, had feeling of hopelessness, and anxiety. *Id*. at 403.

In June 2012, Stephen W. Halmi, Psy.D. examined and evaluated Plaintiff for the state agency. *Id.* at 360-70. Dr. Halmi's summary and conclusion questions the results of the evaluation as follows:

> I opine the results of the evaluation are tenuous because she overendorsed psychopathology in my opinion. She appeared emotionally labile during this evaluation. She reported experiencing every symptom of every psychological condition that I presented to her with the exception of generalized anxiety disorder…. Overall, I opine that I have evidence that she is suffering from a Mood Disorder NOS and Anxiety Disorder

> NOS…. I opine that her psychological symptoms are severe and cause a major impairment in her daily functioning.[3]

*Id*. at 367 (footnote added). Dr. Halmi assigned an overall GAF of 40, indicating a major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or the inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). Diagnostic And Statistical Manual Of Mental Disorders, p. 34 (4th Edition, Text Revision 2000). Dr. Halmi opined that Plaintiff "is suffering from serious psychopathology that is chronic in nature." *Id*. at 366. Regarding Plaintiff's ability to respond to work pressure in a work setting, Dr. Halmi opined that Plaintiff would "respond to constructive criticism with hypersensitivity and likely hostility." *Id*. at 368. He further opined that Plaintiff would have difficulty maintaining the motivation and initiative to meet deadlines on a continuous basis. She would likely give up on a task, that she finds challenging, due to her low-frustration tolerance. *Id*. at 368-369.

Plaintiff saw Dr. Laura Spranklin at Specialty Internal Medicine in December 13, 2012. *Id*. at 545-51. It was noted she had fatigue, neck pain, leg swelling, back pain, seizures, sleep disturbance, dysphoric mood, decreased concentration, nervousness, and was anxious. Eight months later, she was admitted to Kettering Behavioral Medical Center for three days due to suicidal ideation. *Id*. at 759-76. She reported she was not feeling safe to

---

3 This is difficult to reconcile with the view expressed, without citation, in the Statement of Errors that "Dr. Halmi also found her to be a reliable historian, by stating her self-report seems accurate." (Doc. #8, *PageID* #855). This quote from the Statement of Errors appears either to constitute an unwarranted inference or is not faithful to information in Dr. Halmi's report.

be outside of the hospital due to increasing thoughts of hurting herself and depressive symptomatology including difficulty falling and staying asleep, poor energy, poor interest, poor appetite, anhedonia, feeling hopeless and helpless, lack of motivation, and tearfulness. *Id*. at 760. On examination, she reported ongoing suicidal thoughts and did not feel safe to leave the hospital. *Id.* She was diagnosed with depressive disorder, not otherwise specified and cluster B personality traits. *Id*. at 762. Cluster B traits generally refer dramatic, emotional, and erratic traits that manifest in, for example, borderline personality disorder.[4]

Plaintiff returned to mental health treatment after her hospitalization. *Id*. at 777-833. She reported depressed mood, loss of interest, sleeping disturbances, loss of appetite, poor motivation and self-esteem, recurrent thoughts of death, and multiple suicide attempts. *Id*. at 794. Dr. Alkhawaga performed a psychiatric assessment in October 2013. Plaintiff reported interrupted sleep, depressed mood, anxiety, and flashbacks. *Id*. at 819. Dr. Alkhawaga diagnosed bipolar disorder, cannabis abuse, post-traumatic stress disorder. He assigned a GAF of 55. *Id*. at 832-33.

## IV. <u>Supplemental Security Income</u>

An applicant qualifies for Supplemental Security Income if he or she is under a disability (among other eligibility requirements). 42 U.S.C. § 1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). A disability, in this context, is a medically determinable physical or mental impairment debilitating enough to prevent the applicant from engaging in substantial gainful activity. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at

---
4 *See* https://www.mentalhelp.net/articles/dsm-5-the-ten-personality-disorders-cluster-b.

469-70.

To determine if Plaintiff was under a disability, ALJ Lombardo applied the five-step sequential evaluation mandated by social security regulation. 20 C.R.F. § 416.920(a)(4). Moving through step 1, the ALJ found at steps 2 and 3 that Plaintiff's impairments—including her severe impairments of "asthma, obesity, fibromyalgia, depression, anxiety, bipolar disorder, and substance abuse"— did not automatically entitle her to benefits. (Doc. #5, *PageID* #s 44-49). At step 4, the ALJ found that the most Plaintiff could do despite her impairments—her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)—was light work[5] with many limitations:

> [S]he can engage in no greater than occasional postural activities such as bending, stooping, kneeling, crouching, crawling, and occasionally climbing ramps or stairs. She cannot work at heights or around hazardous machinery, and she can do no job that requires balancing. I addition, she is limited to unskilled work that is low stress, meaning, for this claimant, work that does not require assembly-line production quotas and that is not fast-paced. She can do no job that requires contact with the general public, and she can have no more than occasional contact with coworkers and supervisors. She cannot be exposed to lung irritants in the workplace as described in the Dictionary of Occupational Titles.

*Id*. at 49. The ALJ further found at step four that Plaintiff lacked past relevant work.

At step five, the ALJ concluded that Plaintiff could do a significant number of jobs in the regional and national economies. These doable jobs, according to the ALJ, included sales clerk, marking clerk, and assembly machine operator. This, in turn, dictated the ALJ's final conclusion that Plaintiff was not under a disability.

---

5 "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. § 404.1567(b).

## V. Standard of Review

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met— that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "(E)ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v.*

*Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## VI. Discussion

Plaintiff contends that the ALJ provided patently false reasons for placing little weight on her treating physician Dr. Hogan's opinions. She further contends that additional evidence support Dr. Hogan's opinions including Ms. Fussichen's observations and opinion, Dr. Halmi's report, and records from Plaintiff's office visit to Advanced Therapeutic Services. Plaintiff emphasizes that Dr. Hogan is her long-term treating physician who has a longitudinal view of her impairments and that her treatment notes support her opinions.

Social Security regulations require ALJs to give the opinion provided by a treating physician controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). "Even if [a] treating physician's opinion is not given controlling weight, there remains a presumption, albeit a rebuttable one, that the opinion…is entitled to great deference." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (internal quotations and citations omitted). This rebuttable presumption requires ALJs to continue weighing treating source opinions under certain factors: the length of the treatment relationship, frequency of examination, specialization of the treating source, supportability of the opinion, and consistency of the opinion with the record as a whole. 20 C.F.R. § 416.927(c)(1)-(6); *see Bowen*, 478 F.3d at 747.

The Regulations also require ALJs to provide "good reasons" for the weight placed

upon a treating source's opinions by stating "specific reasons for the weight placed on a treating source's medical opinions …." *Wilson v. Comm'r of Soc. Sec*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting Soc. Sec. R. 96-2p, 1996 WL 374188 at *5 (1996)). The ALJ's reasons must be "supported by the evidence in the case record …." *Id*. The goals are to assist the claimant in understanding the disposition of his or her case and to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.*

The ALJ set forth the correct legal criteria for weighing Dr. Hogan's opinions. (Doc. #5, *PageID* #s 51-52). The ALJ's application of the correct criteria was reasonable and supported by substantial evidence. A review of Dr. Hogan's treatment notes reveals that she was Plaintiff's long-term treating physician but, over the years, her examinations did not produce objective results sufficient to support her opinions about Plaintiff's physical and mental work limitations. *See id*. at 292-359,383-96, 642-78. Dr. Hogan, moreover, did not provide any meaningful information or explanation in support of her August 2011 opinions. She instead merely identified Plaintiff's diagnoses bipolar disorder, anxiety, and myofascial pain, and she noted that Plaintiff had been referred to psychiatry. *Id*. at 406. The same is true about Dr. Hogan's opinions March 2012 where she merely cited "office visits" as support for her opinions about Plaintiff's physical-work limitations, *see id.* at 408, and merely listed diagnoses to support her assessment of Plaintiff's mental-work limitation, *see id*. at 409-10. Dr. Hogan's missing explanations and lack of objective supporting evidence constitute a sound basis for discounting her opinions. Social security regulations explain, "The better an explanation a source provides for an opinion, the more weight we will give that opinion...." 20

C.F.R. § 416.927(c)(3); *see White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) ("[C]onclusory statements from physicians are properly discounted by ALJs."); *see also* 20 C.F.R. § 416.927 (c)(4) ("Generally, the more consistent an opinion is with the records as a whole, the more weight we will give to that opinion."). In addition, Dr. Hogan's diagnoses alone do not support her opinions about Plaintiff's work limitations. *See Brown v. Comm'r of Soc. Sec.,* 156 F.3d 1228 (6th Cir. 1998) ("The mere diagnosis of a condition says nothing about the severity of the condition."); *see also Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *Hill v. Comm'r of Soc. Sec.,* 560 F. App'x 547, 552 (6th Cir. 2014) ("[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.").

Ms. Fussichen's observations and opinion in July 2008, Dr. Halmi's report, and Plaintiff's records from her visit to Advanced Therapeutic Services in March 2010 do not show that the ALJ committed a legal error or made findings unsupported by substantial evidence. At best for Plaintiff, these records constitute evidence detracting from the ALJ's assessment of her work abilities and limitations. But, the presence in the record of contrary substantial evidence is insignificant given the significant problems in Dr. Hogan's opinions and in the face of substantial evidence supporting the ALJ's reasons for discounting Dr. Hogan's opinions. *See Blakley*, 581 F.3d at 406 ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.' ") (citation omitted).

15

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's final decision concerning Plaintiff's application on July 11, 2014 for Supplemental Security Income be affirmed; and

2.  The case be terminated on the docket of this Court.


April 26, 2017                                                        *s/Sharon L. Ovington*
                                                                              Sharon L. Ovington
                                                                              United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).